Filed 5/24/24  P. v. Leyva CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>MICHAEL ANTHONY LEYVA,<br><br>  Defendant and Appellant. | F086071<br><br>(Super. Ct. No. F18906048)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Arlan L. Harrell, Judge.

Aaron J. Schechter, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Kari Mueller, Amanda Cary and Joseph Penney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Michael Anthony Leyva killed Miguel Arnufo Garcia by a knife stab to the heart during a fight. Defendant was convicted of first degree murder with a true finding on a deadly weapon enhancement. Defendant contends: (1) the trial court prejudicially erred by omitting the lack of lawful justification element and the definition of lawful homicide when it preinstructed the jury on murder; (2) the court abused its discretion in declining defendant's request to dismiss his prior strike pursuant to *Romero*;[1] and (3) the court violated defendant's right to due process by imposing fees and a fine without a determination of defendant's present ability to pay pursuant to *Dueñas*.[2]

The People respond that the trial court did not commit instructional error because the instructions, when viewed in totality, completely and correctly instructed the jury on the elements of murder, justifiable homicide, and self-defense. The People further contend prior strikes may not be dismissed under Penal Code section 1385, subdivision (c),[3] because the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) is an alternative sentencing scheme, not an enhancement and, thus, the court correctly denied defendant's request to dismiss his prior strike even if its reasoning for doing so was incorrect. Lastly, the People argue defendant forfeited his *Dueñas* claim by failing to request a hearing on his ability to pay and the imposition of fees and the fine was appropriate.

We affirm.

## PROCEDURAL BACKGROUND

On August 27, 2019, the Fresno County District Attorney filed an information charging defendant with one count of murder (§ 187, subd. (a)) with a deadly weapon enhancement (§ 12022, subd. (b)(1)). The information also alleged defendant had

---

[1] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*).

[2] *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).

[3] All further statutory references are to the Penal Code unless otherwise stated.

suffered two prior strike convictions within the meaning of the Three Strikes law, which also qualified as serious felony convictions (§ 667, subd. (a)).[4]

On November 17, 2022, the jury found defendant guilty of first degree murder and found true the weapon enhancement allegation.

On February 23, 2023, the trial court sentenced defendant to 50 years to life, consisting of 25 years to life for the sole count doubled for one prior strike. The court dismissed defendant's other prior strike and struck the sentence for the deadly weapon enhancement. The court ordered defendant to pay $1,070 in fees and a restitution fine.

Defendant filed a timely notice of appeal.

## FACTUAL BACKGROUND

### I. Prosecution Evidence

At about 2:35 p.m. on August 19, 2018, defendant drove a white truck to drop off his girlfriend, Irene,[5] at a cell phone store in a strip mall at Belmont and Sixth Street in Fresno. Defendant and Irene had been smoking methamphetamine the whole week prior and defendant had continued to smoke through the previous night. Defendant dropped off Irene in front of the cell phone store and let her know he was going to use the bathroom. Defendant drove away in the truck.

Irene went into the cell phone store and tried to find the employee she had been told could fix her broken phone, but the employee was not at the store. Irene stood around the store waiting because she did not see the truck outside. She felt uncomfortable because two men in the store were staring at her. One of the men was African-American and the other man was of an indeterminate ethnicity.[6]

---

[4] The trial was bifurcated on defendant's two prior strike convictions at defendant's request. Defendant waived his right to a jury trial on the prior convictions and conditionally admitted his prior strikes before jury deliberations.

[5] Defendant and Irene subsequently married in November 2018.

[6] The other man was described as Hispanic, Indian or Pakistani.

Irene asked a customer service employee if she could leave her number for the employee who could fix her phone. Irene still did not see the truck, so she went out of the store. Irene walked to Sixth Street and saw the back of the truck. Irene ran to the truck and grabbed defendant's phone from the middle console to get his number. Irene wrote down defendant's number and went back into the cell phone store. Irene gave the paper with her number to the customer service employee and told her to have the "guy" call her.

When Irene was back in the store, the two men who had been staring at her were outside the store talking to each other. As Irene walked out of the store, the African-American man tried to talk to her. He was telling Irene about a fire across the street. Irene ignored him. The two men then walked away from the cell phone store across the parking lot.

At that point, Miguel Arnufo Garcia walked up to Irene while she was on the sidewalk in front of the cell phone store. Garcia was staggering and slurring. Irene did not want defendant to see her talking to Garcia because defendant was "very jealous" and gets upset when she talks to other men. Garcia was looking at Irene in a lewd manner and said something like, "'Hey, mama, what you working with?'" Irene believed he was trying to pick her up. Garcia wanted Irene to go with him to the alley in the back of the store. Irene said to Garcia something like "'F*** off'" or "'F*** you'" and then jumped through the bushes. She saw defendant's truck coming slow so she jumped into the truck's passenger side.

Irene told defendant, "'Let's go,'" when she got in the truck. Defendant asked Irene, "'Who was that?'" She responded, "'I don't know.'" Defendant said, "'Are you sure it wasn't one of your little boyfriends?'" Irene said, "'No. Let's go.'"

Defendant rolled down the passenger side window and yelled to Garcia, "'Why are you being disrespectful to my girl?'" Defendant and Garcia exchanged words. Irene could not hear what Garcia was saying while the two argued. Irene tried to roll up the

4.

passenger side window, but defendant kept the window down with the driver's side button. Garcia threw his hands up in a boxing motion "like he wanted to fight," but did not approach the truck.

Defendant turned off the truck, got out and walked towards Garcia. Defendant was angry and walked with his shoulders and chest out "like he was going to start fighting." Defendant had a pocketknife with a three-inch blade in his dominant left hand. Garcia dropped something from his hand and came towards defendant. Defendant and Garcia met at a dirt area. The two talked and looked "like they were about to start fighting."

Irene remained in the truck and looked around for her phone. She put her head back and closed her eyes for a split second. While Irene was not looking, defendant did a "prison stab" [7] on Garcia straight to his heart. Defendant plunged the knife to just before the hilt or at the hilt. When Irene looked back at defendant and Garcia, defendant was on his stomach on the ground. She thought defendant got hit and landed on the ground when she saw him down and missing a shoe. Garcia was standing over defendant about two feet away. Garcia touched his chest and rubbed his two fingers together. He lifted his shirt up and tried to pull a knife from his waist, but the knife got stuck on Garcia's pants. Irene yelled at defendant to get up and fight back when she saw Garcia trying to pull the knife. Defendant got up and walked back to the truck.

Garcia ran towards the truck. Defendant got into the driver's seat and tried to start the truck. His hand was shaking, and he dropped the keys. Garcia used his knife to pop the truck's front and back tires on the passenger side.

The truck's tires started to deflate as defendant drove off. Irene yelled at defendant to take her to a friend's tire shop across the street. As they drove, defendant

---

**7**      A "prison stab" reportedly refers to a quick in and out stab to the kidneys or a main artery.

pulled the knife out of his left pocket, handed it to Irene and told her to check it for blood. Defendant looked shocked because Garcia did not fall right away after defendant stabbed him. Defendant started to scream and said he was going to go back to prison for life. Defendant said he needed to know how deep the knife went in. Irene opened the knife and saw a little blood on it.

When Irene and defendant arrived at the tire shop, Irene got out of the truck and told an employee she needed her tires changed. Irene took the knife and threw it over a fence behind the tire shop.[8] The shop changed the truck's two passenger side tires.

At some point after defendant and Irene drove away, people in the cell phone store and a neighboring business saw Garcia lying face down on the sidewalk outside the cell phone store. There was blood on the ground and coming from Garcia. Garcia was gurgling and asking for help. Employees from the nearby businesses called 911.

Fresno Police Department (FPD) officers and emergency medical services (EMS) were dispatched to the scene. Garcia was unresponsive and had no pulse when the police arrived. The police and EMS attempted lifesaving measures to no avail. An autopsy determined Garcia's cause of death was penetration of the heart due to a single stab wound in the chest.[9]

Defendant and Irene returned to their house in the truck later that day. Defendant dumped the clothes he was wearing on the way back to the house.

A few days after the stabbing, Irene dropped defendant off at her former stepdad's house in Oxnard, where defendant stayed a few days. Irene learned defendant wanted to turn himself in and picked him up in Valencia. Irene and defendant drove to Reno and stayed in a hotel for one night. While they were in Reno, defendant asked Irene who she

---

[8]     The neighboring resident later found the knife in their backyard and threw it away. FPD's search of Irene's and defendant's house unearthed the knife's original packaging.

[9]     The toxicology report of Garcia showed he had a blood alcohol level of 0.12 percent.

had been text-messaging.  When Irene confirmed she had been text-messaging someone, defendant jumped up and started choking Irene until she could not breathe.  Defendant threatened to kill them both.

Defendant and Irene returned to Fresno the next day.  On September 1, 2018, Irene told FPD that defendant wanted to turn himself in and directed them to a motel where defendant was staying.  FPD officers went to the identified motel, where defendant exited his room with his hands up and was arrested without incident.

Irene gave various false versions of events to protect defendant.  Irene decided she wanted to "do what's right" and "tell the truth."  She asserted the story she told during her trial testimony was true.  Defendant repeatedly attempted to persuade Irene not to testify during pendency of the case.

## II.     Defense Evidence

Defendant's long-time friend, Robert, worked with defendant in 2018 for an employer who hauls mail for the United States Postal Service.  Defendant worked as a driver.  The employer conducted random drug testing of employees.  Robert never saw defendant act in a way that made Robert think he was under the influence of methamphetamine while working.  Robert was aware defendant used methamphetamine in the past.

In November 2020, Garcia's older sister received a message through social media purportedly from Irene.  The message said defendant was "'getting out'" and to let the family know.  The message also said, "'[c]all me'" and provided a number.  Irene and defendant continued to communicate with each other by phone and letters while the case was pending.

## DISCUSSION

## I.     Jury Instructions

Defendant contends the trial court erred by omitting the lack of lawful justification element when it preinstructed the jury on the elements of murder.  Defendant further

argues the court should have instructed the jury on lawful and unlawful homicide when the court elected to preinstruct the jury on the definition of homicide. While defendant acknowledges the court correctly and completely instructed the jury after the close of evidence, defendant alleges the court's preinstructions improperly and unfairly biased the jury by allowing jurors to sit through the entire trial with a misunderstanding of the elements of murder. Defendant avers the court's error in omitting the lack of justification element in its preinstructions violated his rights to due process and a fair trial and is prejudicial under *Chapman v. California* (1967) 386 U.S. 18 because this was a "close" self-defense case.

## A. *Additional Background*

At the beginning of trial and prior to opening statements, the trial court discussed its intended pre-evidence instructions with the prosecutor and defense counsel. Defense counsel requested the court include CALCRIM No. 505.[10] The court was not inclined to give CALCRIM No. 505 "at this point" and stated it would give this instruction as well as other instructions at the close of evidence. Defense counsel then requested the court give CALCRIM No. 500 regarding lawful or unlawful homicide.[11] The court also declined this request and stated these are instructions the court gives "post evidence." Defense counsel "wanted to make a record that the Defense is requesting specifically because this case and the defenses in this case are geared entirely towards self-defense and justified—that the killing here was not unlawful, you know, the jury should be instructed about that as well as the other principles of homicide." To which the court

---

[10]     CALCRIM No. 505 provides form instructions on justifiable homicide and self-defense.

[11]     CALCRIM No. 500 provides the following instruction in brackets: "A homicide can be lawful or unlawful. If a person kills with a legally valid excuse or justification, the killing is lawful and he or she has not committed a crime. If there is no legally valid excuse or justification, the killing is unlawful and, depending on the circumstances, the person is guilty of either murder or manslaughter. You must decide whether the killing in this case was unlawful and, if so, what specific crime was committed. I will now instruct you in more detail on what is a legally permissible excuse or justification for homicide."

responded, "to be abundantly clear, the jurors will be fully instructed on the law of homicide as [it] applies based upon the evidence presented during the course of the trial." In response, defense counsel argued: "[I]f the Court is declining the Defense's request for theadditional instructions, the Defense would ask that the Courtnot give any of the [CALCRIM No.] 500 series instructions regarding any of the elements of the crime to be charged, or the [CALCRIM No.] 3145 instruction regarding the elements of personal use of a weapon. If we're going to instruct on the elements, then let's instruct on them all at once.And if we're going to instruct on part of the elements, then I'd ask that we instruct on the self-defense element." The court responded: "What the Court would be instructing on are the allegations in the Information that the People are required to prove to the jury beyond a reasonable doubt. So the Court would be giving the instructions as they have been presented to counsel and asthe Court just stated a moment ago."[12]

During the pre-trial instructions and before opening statements, the trial court said to the jury in relevant part:

> "Now [the Court is] going to give you what [the Court] refer[s] to aspre-evidence instructions. These are the very basic instructions and advise you of the elements that the People must meet to prove the allegations. At the conclusion of all of the evidence, [the court] will give you another set of instructions which will be much more comprehensive, which will reflect the evidence that was presented during the course of the trial, because only then will [the court] know and counsel will know what evidence was actually presented and the Court will then be in a position to give you the instructions that apply to the evidence that you have actually received. [¶] … [¶]

> "After you have heard all the evidence and before the attorneys give their final arguments, [the court] will instruct you on the law that applies to the case. [¶] … [¶]

---

[12] On the sole count, the information alleged: "On or about August 19, 2018, in the above named judicial district, the crime of MURDER, in violation of … Section 187[, subdivision ](a), a Felony, was committed by [defendant], who did unlawfully, and with malice aforethought murder Miguel Arnurfo Garcia, a human being."

"Keep an open mind throughout the trial. Do not make up your mind about the verdict or any issue until after you have discussed the case with other jurors during deliberations.…"

The court preinstructed the jury on the murder charge using parts of CALCRIM Nos. 500 and 520:

"Homicide is the killing of one human being by another. Murder is a type of homicide. The defendant is charged with murder. [¶] The defendant is charged in Count One with murder, in violation of … Section 187. To prove that the defendant is guilty of this crime, the People must prove that: [¶] One, the defendant committed an act that caused the death of another person; [¶] And two, when the defendant acted, he had a state of mind called malice aforethought."

After the close of evidence, the trial court instructed the jury using CALCRIM No. 500 in pertinent part: "A homicide can be lawful or unlawful. If a person kills with a legally valid excuse or justification, the killing islawful and he or she has not committed a crime. If there isno legally valid excuse or justification, the killing is unlawful and, depending on the circumstances, the person is guilty of either murder or manslaughter. You must decide whether the killing in this case was unlawful, and if so, what specific crime was committed." The court proceeded to instruct the jury on "what is a legally permissible excuse or justification for a homicide," including on self-defense (CALCRIM No. 505). The court also instructed the jury on murder (CALCRIM Nos. 520, 521 and 522), imperfect self-defense (CALCRIM No. 571), and heat of passion (CALCRIM No. 570). The jury was instructed if the court "repeat[s] any instruction or idea, do not conclude that it is more important than any other instruction or idea just because [the court] repeated it." The court provided the jury with a written copy of the instructions.

## B.    *Applicable Legal Principles*

"In criminal cases, even absent a request, a trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence." (*People v. Booker* (2011) 51 Cal.4th 141, 179.) "[N]o particular form is required as long as the instructions are complete and correctly state the law. [Citation.] In considering a

10.

claim of instructional error we must first ascertain what the relevant law provides …. The test is whether there is a reasonable likelihood that the jury understood the instruction in a manner that violated the defendant's rights." (*People v. Andrade* (2000) 85 Cal.App.4th 579, 585.) We make this determination by considering "the entire charge of the court, not from considering only parts of an instruction or one particular instruction." (*People v. Smith* (2008) 168 Cal.App.4th 7, 13 (*Smith*); accord, *People v. Young* (2005) 34 Cal.4th 1149, 1202.)

"All criminal defendants have the right to 'a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.'" (*People v. Merritt* (2017) 2 Cal.5th 819, 824.) "The trial court has a sua sponte duty to instruct the jury on the essential elements of the charged offense." (*Ibid.*)

"California defines the crime of murder as the unlawful killing of a human being with malice aforethought." (*People v. Schuller* (2023) 15 Cal.5th 237, 243; see § 187, subd. (a).) "Under California law, the elements of murder—that the prosecution, by definition, is required to prove beyond a reasonable doubt—are as follows: (1) the defendant committed an act that caused the death of another person; (2) when the defendant acted, he had a state of mind called malice aforethought; and (3) he killed without lawful excuse or justification." (*People v. Navarette* (2016) 4 Cal.App.5th 829, 843.)

### C.    *Standard of Review*

Defendant argues the trial court's preliminary instructions to the jury were incorrect and inadequate because the court omitted the lack of justification element of murder. Defendant further argues this purported instructional error is subject to de novo review. The People acknowledge whether an instruction correctly states the applicable law is subject to de novo review, but argue defendant is effectively challenging the timing of the court's instruction. Because defendant concedes the court correctly instructed the jury on the lack of justification element at the close of evidence, the People argue the

11.

alleged error must be reviewed for abuse of discretion. The People have the better argument.

A challenge to whether an instruction correctly states the law is reviewed de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) Here, as defendant concedes, "the trial court correctly instructed the jury on lack of justification at the conclusion of the evidence." This is also not a case where an element of the offense was omitted entirely from the jury's instructions because the jury was fully instructed on all the elements of murder and lawful justification of a homicide before deliberations. (Cf. *People v. Merritt, supra*, 2 Cal.5th at p. 824 [the trial court's failure to instruct the jury on the elements of robbery was constitutional error].) "The absence of an essential element from one instruction may be cured by another instruction or the instructions taken as a whole." (*Smith, supra*, 168 Cal.App.4th at p. 13; accord, *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.) Because the court correctly and completely instructed the jury considering the instructions as a whole and defendant simply challenges the *timing* of certain instructions, we apply an abuse of discretion standard. (*Smith, supra*, at p. 16; *People v. Chung* (1997) 57 Cal.App.4th 755, 758–760 (*Chung*).) "Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Wilson* (2021) 11 Cal.5th 259, 304.)

### D. Analysis

Trial courts have wide discretion on when to instruct the jury. (*Smith, supra*, 168 Cal.App.4th at p. 14; *People v. Lamb* (1988) 206 Cal.App.3d 397, 400 ["when to instruct a jury is a matter within the trial court's discretion"]; §§ 1093, 1094.) Only certain preinstructions must statutorily be provided to the jury. (*Smith, supra*, at p. 15; § 1122.) Specifically, "the court shall instruct the jury generally concerning its basic functions, duties, and conduct." (§ 1122, subd. (a).) These preinstructions "shall" also include

"various matters, including admonitions that the jurors shall not discuss the case, read media accounts, conduct their own investigations, or receive any payment for supplying information regarding the trial.  [Citation.]  Such admonishments are directed at precluding the jurors from being exposed to and influenced by outside sources or extrinsic evidence during the trial as well as from deciding the case before it is submitted to them.  To have any real effect, these instructions must be given before the evidence is presented at trial." (*Smith, supra*, at p. 15; see § 1122, subd. (a).)

Section 1093 outlines the general order in which a criminal trial "shall proceed … unless otherwise directed by the court .…"  The order of proceedings "may be departed from" when required by "the state of the pleadings" or "for good reasons, and in the sound discretion of the court .…"  (§ 1094.)  "At the beginning of the trial or from time to time during the trial, and without any request from either party, the trial judge may give the jury such instructions on the law applicable to the case as the judge may deem necessary for their guidance on hearing the case.…"  (§ 1093, subd. (f).)  After the conclusion of evidence and any closing arguments, "The judge may then charge the jury, and shall do so on any points of law pertinent to the issue .…"  (*Ibid.*)  The court may provide the jury with a written copy of the instructions and must do so upon the jury's request.  (*Ibid.*)

This court long ago gleaned from sections 1093 and 1094 that "*when* to instruct a jury is a matter within the sound discretion of the trial judge; he [or she] may instruct at any time during the trial." (*People v. Valenzuela* (1977) 76 Cal.App.3d 218, 221.)  "Although discretionary, the practice of preinstructing a jury on general principles of law before opening statements has long been recognized by California appellate courts." (*Smith, supra*, 168 Cal.App.4th at p. 15.)  The "purpose of preinstructing jurors is not to avoid the necessity of instructing at the close of argument; rather, it is to give them some advance understanding of the applicable principles of law so that they will not receive the evidence and arguments in a vacuum." (*Valenzuela, supra*, at p. 222.)  "Moreover,

'[c]alling the attention of the jury at the commencement of the trial, to legal problems to be met, if fairly done, may be of great value in enabling the jury to understand the purpose and thus properly evaluate various bits of the evidence.'" (*Smith, supra*, at p. 15.) "[L]ike other instructional error claims, those challenging the timing of instructions as an abuse of discretion or a violation of due process are determined based on a review of the instructions as a whole in light of the entire record." (*Id.* at p. 16.)

Defendant argues the trial court's preinstructions were not "'fairly done.'" Defendant first faults the court for providing solely two elements of murder and argues the court should have included the third element from the form instructions in CALCRIM No. 520.[13] CALCRIM No. 520 generally lays out the elements of first degree or second degree murder with malice aforethought.[14] The third element of the form CALCRIM No. 520 instructions for murder is: "(*He/She) killed without lawful (excuse/[or] justification*).]" The notes for the form instruction state "<Give element 3 when instructing on justifiable or excusable homicide.>" (Judicial Council of Cal., Criminal Jury Instns. (2022) p. 245.) Jury instructions in "[i]talicized notes between angle brackets in the language of the instruction itself signal important issues or choices." (*Id.* at p. xxv.) The Bench Notes to CALCRIM No. 520 offer in relevant part: "The court has a sua sponte duty to instruct on the first two elements of the crime. If there is sufficient

---

[13] While defendant cites CALCRIM No. 505, the instructions for self-defense, defendant's argument focuses on the elements of murder as provided in CALCRIM No. 520. We presume the cite to CALCRIM No. 505 was in error.

[14] "The California jury instructions approved by the Judicial Council are the official instructions for use in the state of California…." (Cal. Rules of Court, rule 2.1050(a).) This includes the CALCRIM instructions. (*People v. Lucas* (2014) 60 Cal.4th 153, 294, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53–54, fn. 19.) California Rules of Court, rule 2.1050(f) provides: "Use of the Judicial Council instructions is strongly encouraged. If the latest edition of the jury instructions approved by the Judicial Council contains an instruction applicable to a case and the trial judge determines that the jury should be instructed on the subject, it is recommended that the judge use the Judicial Council instruction unless the judge finds that a different instruction would more accurately state the law and be understood by jurors.…"

evidence of excuse or justification, the court has a sua sponte duty to include the third, bracketed element in the instruction." (Judicial Council of Cal., Criminal Jury Instns. (2022) at p. 247.) The Bench Notes then cite *People v. Frye* (1992) 7 Cal.App.4th 1148, 1155–1156 (*Frye*).

The *Frye* court held that "in a homicide case, the word 'unlawful' is a term of art [because i]t connotes a homicide with the absence of factors of excuse or justification." (*Frye, supra*, 7 Cal.App.4th at p. 1155.) Excuse is "best exemplified by accident or misfortune" (citing § 195) while "justification is exemplified by the concept of self-defense" (citing §§ 197–198), "although these are not the exclusive bases for excuse or justification." (*Frye, supra*, at p. 1155, fn. omitted.) The *Frye* court further held the "use of force or violence against another person is not presumed to be unlawful in the absence of excuse or justification; it is unlawful by definition. [Citation.] Thus, as used in various homicide instructions, the word unlawful does not signify an affirmative element of the offenses. It is instead a negative element which simply means there is an absence of excuse or justification." (*Ibid.*) Excuse and justification are affirmative defenses that must be raised by the defendant. (*Id.* at p. 1154.) Unlike the other two elements of murder, these affirmative "defenses are not elements of the offenses which the prosecution is required to prove unless they are properly raised .…" (*Id.* at p. 1160.) This does not mean the burden of proof shifts to the defendant, but instead means "in the absence of evidence supporting excuse or justification or of defense reliance upon such matters, theories of excuse or justification are not regarded as pertinent to the charged offense." (*Id.* at p. 1156.) The *Frye* court thus concluded that "excuse and justification are affirmative defenses which need not and should not be put before the jury in the absence of some evidence supporting them or defense reliance upon them." (*Id.* at p. 1159.) "Under this scheme we treat the absence of excuse or justification, and hence the question of unlawfulness, *as an element of an offense only if such a defense is raised in some manner*." (*Ibid.*, italics added.)

15.

It is against this backdrop we consider the recommendation in the Bench Notes to CALCRIM No. 520 to instruct on the third element of murder when providing instructions on justifiable or excusable homicide. If the question of lawfulness is treated as an element of the offense only where excuse or justification is raised as a defense, it logically follows this element be given together with instructions on those theories to provide the jury with the relevant legal principles to decide whether the homicide was lawful. Given the prosecution's primary witness, Irene, had told various versions of events about the killing and was an admittedly problematic witness,[15] the trial court prudently chose to limit preinstructions to general principles of law regarding the offense and wait until the close of evidence before instructing on justifiable or excusable homicide, and correspondingly on the third element of murder. While defense counsel argued prior to trial the "defenses in this case are geared entirely towards self-defense and … that the killing here was not unlawful," it was unclear at that point if defendant would be testifying and, accordingly, whether there would be sufficient evidence to warrant instruction on a theory of complete or imperfect self-defense. "[I]mperfect self-defense occurs when a defendant acts in the actual but unreasonable belief that he or she is in imminent danger of great bodily injury or death. [Citation.] Imperfect self-defense differs from complete self-defense, which requires not only an honest but also a reasonable belief of the need to defend oneself." (*People v. Simon* (2016) 1 Cal.5th 98, 132.) A trial court is not obligated to instruct on complete or imperfect self-defense where the record is "devoid of evidence" of the defendant's "subjective fear." (*Id*. at p. 134; see *People v. Mejia-Lenares* (2006) 135 Cal.App.4th 1437, 1446 [the trial court

---

**15** During her opening statement, the prosecutor expressly referred to Irene as a "problematic witness" due to Irene's battery conviction, history of drug use and false statements to the police about what occurred. Defense counsel admitted prior to jury selection he had "no idea what [Irene was] going to say when she" testifies. Defense counsel acknowledged Irene's primacy as "the only person whowill testify to a number of the factors that [the prosecutor] is going to later rely upon to say that [defendant is] guilty of an intentional killing as opposed to self-defense."

16.

need not instruct on imperfect self-defense on request absent substantial evidence to support the theory].)  Under the circumstances here, the court rationally concluded it must hear all the evidence before determining if there was sufficient evidence to warrant instructions on self-defense.  Because *Frye* teaches instructions on justifiable or excusable homicide need not and should not be put before the jury in the absence of supporting evidence or reliance upon them, the court properly refrained from instructing the jury on the lawfulness element until the evidence revealed which defense theories, if any, were raised by the facts and must also be instructed upon.

Additionally, "[b]reaking instructions into phases of the trial does not tax the attention span of jurors, provides timely and useful information to jurors as the trial progresses, and arguably benefits the parties."  (*Chung, supra*, 57 Cal.App.4th at p. 760.)  This is precisely what the trial court did by providing the jury with a preliminary framework on the murder charge and deferring more comprehensive instructions, including on defenses, until the close of evidence.  Defendant cites no authority the court was required to include the lawful justification element of murder in its *preinstructions* and the court's decision not to do so was not arbitrary or capricious.[16]

Defendant next argues when the trial court elected to define homicide in its preinstructions using CALCRIM No. 500, the court should have also provided the following bracketed instruction from CALCRIM No. 500:  "A homicide can be lawful or unlawful.  If a person kills with a legally valid excuse or justification, the killing is lawful and he or she has not committed a crime."

The Bench Notes to CALCRIM No. 500 regarding the bracketed instruction states:  "*If no homicide defense instructions are given*, do not give the bracketed language in the second paragraph beginning 'A homicide can be lawful ….'"  (Judicial Council of Cal.,

---

[16]    Defendant surmises the trial court erroneously believed the prosecution was not required to prove a lack of justification.  The record does not support this unfounded assertion.

17.

Criminal Jury Instns. (2022) Bench Notes to CALCRIM No. 500, p. 217, italics added.) Jury instructions in brackets "provide optional choices that may be necessary or appropriate, depending on the individual circumstances of the case[.]" (*Id.* at p. xxvi.) Because the trial court was not providing homicide defense instructions during its preinstructions, the court properly chose not to include the bracketed instruction regarding lawfulness. As previously discussed, the trial court is only required to instruct the jury on excuse or justification where there is evidence supporting those theories. (*Frye, supra*, 7 Cal.App.4th at p. 1156; see *People v. Booker, supra*, 51 Cal.4th at p. 179 [a trial court has a duty to instruct "on a particular defense only if it appears the defendant is relying on such a defense, or substantial evidence supports the defense"]; *People v. Ponce* (1996) 44 Cal.App.4th 1380, 1386 ["a trial judge has the authority to refuse requested instructions on a defense theory for which there is no supporting evidence"].) As above, the court logically concluded this bracketed instruction is more appropriately given after the evidence showed which defenses, if any, had evidentiary support and must be instructed upon.

We also "assume the jurors are intelligent persons capable of understanding and correlating all the instructions." (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332.) The trial court expressly billed its preinstructions as "very basic" and promised to give another set of "much more comprehensive" instructions at the close of evidence. The court noted only then will it know what evidence was presented and be able to give the instructions applicable to the evidence the jury received. The court promised to instruct the jury on the law applicable to the case. The court therefore explicitly conveyed to the jury its preinstructions were partial instructions, and that additional and more complete instructions would be given after all the evidence was received, including on the applicable law. The court emphasized to the jury to keep an open mind throughout the trial. The court further instructed the jury not to decide the verdict or any issue before deliberations (CALCRIM No. 101), an instruction the court repeated multiple times

throughout the trial. After the trial, the court provided comprehensive instructions to the jury on murder, defenses, and the bracketed instruction from CALCRIM No. 500. The court provided the jury with a full copy of the instructions for the jurors to consult during their deliberations.

The jury was further informed the question of lawfulness was a consideration before and after the evidence was presented because both the prosecutor and defense counsel discussed the unlawful element of murder during opening statements and again in closing arguments. (See *People v. Young, supra*, 34 Cal.4th at p. 1202 ["The reviewing court also must consider the arguments of counsel in assessing the probable impact of the instruction on the jury."].) In the prosecutor's opening statement, she asserted the jury "will be able to see this was an unlawful killing" at the end of the evidence. Defense counsel, during his opening statement, asked the jury "to focus on … was the killing of … Garcia done unlawfully[?]" During her closing argument, the prosecutor read verbatim part of the bracketed instruction about lawful justification of a homicide from CALCRIM No. 500. The prosecutor stated a homicide can be lawful or unlawful, and acknowledged if defendant killed Garcia in complete self-defense, defendant is not guilty of any crime. The prosecutor further noted if a person kills with a legal justification or excuse, the person is not guilty of murder and expressly said the prosecution bears the burden of proving beyond a reasonable doubt the killing was not justified. For his part, defense counsel argued in closing, the jury must decide if the prosecution proved beyond a reasonable doubt the killing was unlawful, and if it was in self-defense, the prosecution did not prove it was unlawful. Defense counsel also stated the government has the burden to disprove self-defense.[17]

---

[17] Because counsels' arguments and the jury instructions expressly stated the prosecution bears the burden of proving every element of murder, including that the murder was not justified, beyond a reasonable doubt, defendant's implied contention the instructions circumvented the requirement the prosecution must prove every element beyond a reasonable doubt is without merit.

19.

Defendant speculatively asserts the lack of the third element of murder in the preinstructions "unfairly biased" the jury. Nothing in the record indicates the jury did not correctly apply the law as instructed in deciding defendant's guilt. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 821 [jurors are presumed to follow instructions absent evidence to the contrary].) Defendant identified no evidence the jury was confused about the elements of murder or lawful justification of a homicide. "In the absence of such evidence, the presumption that the jurors regularly performed their duties prevails [citation] …." (*Chung, supra*, 57 Cal.App.4th at p. 760; accord, *Smith, supra*, 168 Cal.App.4th at p. 20; § 664.)

Even if we found the trial court erred in its preinstructions, any error would be harmless under either standard of prejudice. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California, supra*, 386 U.S. at p. 24.) We simply cannot agree with defendant this was a close self-defense case. The "ordinary self-defense doctrine … may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1.) Defendant initiated a verbal argument with Garcia for being disrespectful to his "'girl.'" In response to Garcia's raised fists, defendant got out of the truck and walked toward Garcia with a knife in his dominant hand. Garcia had not revealed his own knife at that point, so defendant escalated the fight by approaching Garcia and introducing a deadly weapon into the exchange. Defendant intentionally stabbed Garcia directly in the heart, an indisputably vital organ. Defendant plunged the knife all the way to just before or at the hilt. Defendant was shocked Garcia did not fall immediately, indicating defendant understood the wound's severity. The evidence of defendant's guilt for murder was thus overwhelming. (*Harrington v. California* (1969) 395 U.S. 250, 254 [harmless error if guilt is established by overwhelming evidence].)

20.

Based on this record and the instructions as a whole, the trial court did not violate defendant's rights to due process and a fair trial by preinstructing the jury on the elements of murder without including the lack of justification element or lawful justification of a homicide where the instructions were fully given at the close of evidence.

## II. Dismissal of Prior Strike Conviction

Defendant argues the trial court abused its discretion in declining his request to dismiss his prior strike because the court arbitrarily and capriciously concluded defendant would pose a danger to public safety if he were eligible for parole at the age of 75. Defendant contends if the court had not erroneously found dismissal of the prior strike would endanger public safety, there is a reasonable probability the court would have dismissed the prior strike based on mitigating factors in section 1385, subdivision (c).

### A. Additional Background

Defendant admitted he suffered two prior strike convictions. The first prior strike conviction was for voluntary manslaughter (§ 192, subd. (a)) on November 4, 1991, when an intoxicated defendant stabbed another man to death in an argument.[18] Defendant and the victim were "hanging out" on the same street with two different groups. There was a friendly interaction between the groups when defendant and his group pulled up in their car. The victim went into his sister's apartment and came out with a plate of tacos. A group outside, including defendant, started asking the victim for a piece of the food. The victim told defendant something like "get off of me" and "get the hell out of here." The victim turned towards another person and defendant stabbed the victim in the chest. Defendant ran away with the victim's friends initially pursuing him before the friends returned to the victim and drove him to the hospital. The victim lost consciousness en route and died at the hospital.

---

[18]    Defendant included facts about this conviction in his *Romero* motion and a witness testified to the circumstances of this stabbing before the trial court during an Evidence Code section 402 hearing prior to trial on this matter.

Defendant's other prior strike conviction was for first degree residential burglary (§§ 459, 460, subd (a)) on June 26, 1991. The probation officer's report reflects defendant's additional criminal record included the following convictions: disorderly conduct in 1991; escape from jail in 1991; threatening phone calls in 2005; corporal injury on a spouse and resisting a peace officer in 2002; furnishing a minor with marijuana in 2004; obstructing a peace officer without violence in 2003; and possession of a controlled substance in 2011. Defendant also had multiple parole violations between 1999 and 2008.

The probation officer recommended a one-year determinate term for the weapon enhancement followed by a consecutive indeterminate term of 75 years to life, consisting of 25 years to life tripled for the two prior strikes. The probation officer explained the rationale for this recommendation: "Although the defendant remained free from law violations for nine years, the commission of the current matter clearly demonstrates a lack of rehabilitation and a propensity for violence, at even the slightest trigger."

Prior to the sentencing hearing on February 23, 2023, defendant filed a *Romero* motion, inviting the trial court to strike his two prior strike convictions. In his motion and during the sentencing hearing, defendant argued four of the nine factors from section 1385, subdivision (c)(2), weighed greatly in favor of dismissing the "enhancements." Specifically, defendant argued: (1) multiple enhancements were alleged (*id.*, subd. (c)(2)(B)); (2) the enhancement would result in a sentence of over 20 years (*id.*, subd. (c)(2)(C)); (3) the prior convictions are more than five years old (*id.*, subd. (c)(2)(H)); and (4) defendant was "technically" an adult at the time of the convictions, but he was "just" 19 (*id.*, subd. (c)(2)(G)). Defendant further argued his first degree murder conviction would result in an indeterminate term of 25 years to life and he would be 76 years old when he qualifies for parole if the strikes were stricken. Defendant posited there was no reason to believe he would present a danger to the public if released at 76 years old on parole.

The prosecution opposed defendant's request. The prosecution argued age was not an appropriate consideration for dismissal. The prosecution also argued defendant is a risk to public safety because he appears willing to engage in this behavior at any point in his life.

The trial court noted section 1385 "talks about enhancements" and queried if the Three Strikes law is an enhancement. Defendant "believe[d] so," but the prosecution argued the Three Strikes law is an alternative sentencing scheme. The prosecution clarified the enhancement was for the weapon, but the two strike convictions placed defendant in a different sentencing structure.

In explaining its ruling on the *Romero* motion, the trial court stated in pertinent part:

> "The Court has read and considered the invitation to exercise its *Romero* discretion under … section 1385. Given the amendments to [section] 1385, this Court feels bound to exercise its discretion in a particular way. Given that the defendant here is facing three enhancements, two under the Three Strikes law and one under … section 12022[, subdivision ](b)(1) for the use of a deadly or dangerous weapon, a knife, and given that the defendant is looking at a sentence for the crime itself of first degree murder of 25 years to life, the Court believes that it would be in the interest of justice under [section] 1385 to exercise its discretion and dismiss for the purpose of sentencing only the serious felony prior for … section[s] 459/460, first degree residential burglary, out of Stanislaus County, as well as the enhancement .…

> "It is difficult—the Court is finding difficulty in exercising its discretion as to the voluntary manslaughter conviction from 1991 out of Fresno County, because, again, [defendant] has killed twice. Based upon the representation, 30 years apart. So what is to prevent him from doing it again in the future, if he were released at the time of parole at around 75. That's what bothers me. And I think that would weigh on the minds of most judicial officers who are forced to make this decision.

> "[Section] 1385 provides that if the enhancement would result in a sentence of in excess of 20 years, then the Court shall dismiss it unless to do so would pose a danger to public safety.

"Considering the circumstances of the prior conviction and the circumstances of this current case and conviction, this Court is not satisfied that it would be in the interest of—I believe to strike that serious felony prior would not be appropriate. So the Court is declining the request to dismiss the serious felony prior arising from the 1991 conviction for voluntary manslaughter. That's based upon the similar nature of the offenses, the time between the prior offense and this offense. While the Court is mindful that it is more than five years prior, the Court is mindful that the serious felony prior added to the sentencing in this case would add more than a sentence of 20 years.

"This case was brought about by the anger of [defendant]. The Court is not satisfied that at whatever age [defendant] cannot again give in to his anger, which could result in serious bodily injury or death to another individual. Again, that is based upon the history that has been presented in the prior case and this case." (Italics added.)

After the court declined to strike the voluntary manslaughter conviction, the court sentenced defendant to 50 years to life, consisting of 25 years to life doubled for that prior strike.

## B.     *Authority to Dismiss Prior Strike Convictions*

In 1994, the Three Strikes law was enacted "to ensure longer prison sentences and greater punishment for those who commit a felony and have been previously convicted of one or more serious or violent felony offenses." (§ 667, subd. (b); accord, *Romero, supra*, 13 Cal.4th at pp. 504–505.) The law "consists of two, nearly identical statutory schemes …. The earlier provision, which the Legislature enacted, was codified as section 667, subdivisions (b) through (i). The later provision, which the voters adopted through the initiative process, was codified as section 1170.12." (*Romero, supra*, at p. 504.) "[B]oth statutes have this effect: When a defendant is convicted of a felony, and it is pleaded and proved that he has committed one or more prior felonies defined as 'violent' or 'serious,' sentencing proceeds under the Three Strikes law '[n]otwithstanding any other law' (§ 667, subd. (c); § 1170.12, subd. (a).)" (*Id.* at p. 505.) "Under that law, if a defendant reoffends after having suffered a first qualifying felony conviction, a doubled sentence is mandatory. If, after having suffered two qualifying felony

convictions, an offender commits a third qualifying felony, the Three Strikes law presumes he or she is incorrigible and requires a life sentence." (*People v. Vargas* (2014) 59 Cal.4th 635, 638; see §§ 667, subd. (e)(1), (2)(A), 1170.12, subd. (c)(1), (2)(A).)

Under section 1385, subdivision (a), a trial court "may, either on motion of the court or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed.…" In *Romero*, our Supreme Court held that section 1385, subdivision (a), gives trial courts the power to dismiss a prior strike conviction under the Three Strikes law. (*Romero, supra*, 13 Cal.4th at p. 504.) While this statutory subdivision only permits dismissal on the court's or the prosecution's motion, a defendant may "'invite the court to exercise its power by an application to strike a count or allegation of an accusatory pleading, and the court must consider evidence offered by the defendant in support of his assertion that the dismissal would be in furtherance of justice.'" (*People v. Carmony* (2004) 33 Cal.4th 367, 375 (*Carmony*).)

Section 1385 has also long permitted a trial court to dismiss or strike an enhancement. (*People v. Thomas* (1992) 4 Cal.4th 206, 209.) Effective January 1, 2022, Senate Bill No. 81 (2021−2022 Reg. Sess.) (Senate Bill 81) amended section 1385 to specify mitigating circumstances the trial court must consider in determining whether to dismiss an enhancement. (Stats. 2021, ch. 721, § 1; *People v. Anderson* (2023) 88 Cal.App.5th 233, 238–239, review granted Apr. 19, 2023, S278786.) As amended, section 1385, subdivision (c), now provides: "(1) Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute. [¶] (2) In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public

safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others."[19]

Defendant contends there is a reasonable probability the trial court would have dismissed his prior strike based on two mitigating factors in section 1385, subdivision (c)(2): the enhancement could result in a sentence of over 20 years (*id.*, subd. (c)(2)(C)) and the prior conviction is over five years old (*id.*, subd. (c)(2)(H)). The People assert section 1385, subdivision (c), does not affect the court's discretion to dismiss defendant's prior strike conviction because the Three Strikes law is an alternative sentencing scheme, not an enhancement. In a footnote in defendant's reply brief, defendant argues, without substantive discussion, the People are incorrect that section 1385, subdivision (c), does not apply to the Three Strikes law and the court was correct to consider whether to dismiss his prior strike conviction under this statutory subdivision.

Whether section 1385, subdivision (c), as amended by Senate Bill 81 applies to prior strike convictions under the Three Strikes law is a question of statutory interpretation. We review questions of statutory interpretation de novo. (*People v. Tirado* (2022) 12 Cal.5th 688, 694; *People v. Burke* (2023) 89 Cal.App.5th 237, 242 (*Burke*) [whether the amendments to § 1385 made by Sen. Bill 81 apply to prior strike convictions is a question of statutory interpretation subject to de novo review].)

Section 1385, subdivision (c)(1), outlines mitigating factors the trial court must

---

[19] Our Supreme Court is poised to address a split of authority among the Courts of Appeal regarding how to construe and apply the requirement to "'afford great weight'" to evidence of the mitigating circumstances. (*People v. Walker*, S278309, Sup. Ct. Mins., Mar. 22, 2023 <https://supreme.courts.ca.gov/case-information/minutes> [as of May 24, 2024]; *People v. Walker* (2022) 86 Cal.App.5th 386, 398, review granted Mar. 22, 2023, S278309 ["[T]rial courts are to rebuttably presume that dismissal of an enhancement is in the furtherance of justice (and that its dismissal is required) *unless* the court makes a finding that the resultingly shorter sentence due to dismissal 'would endanger public safety.'"]; *People v. Ortiz* (2023) 87 Cal.App.5th 1087, 1097–1098, review granted Apr. 12, 2023, S278894 [disagreeing with the analysis in *Walker* that affording "'great weight'" to the mitigating circumstances creates a rebuttable presumption].) Because section 1385, subdivision (c), is not applicable to prior strike convictions, the disputed statutory language does not affect our analysis here.

consider in deciding whether to "dismiss an *enhancement*."  (Italics added.)  "The term 'enhancement' has a well-established technical meaning in California law.  [Citation.]  'A sentence enhancement is "an additional term of imprisonment added to the base term."'  [Citations.]  It is equally well established that the Three Strikes law is not an enhancement; it is an alternative sentencing scheme for the current offense."  (*Burke, supra*, 89 Cal.App.5th at p. 243; see Cal. Rules of Court, rule 4.405(5).)  "The plain language of subdivision (c) of section 1385 applies only to an 'enhancement,' and the Three Strikes law is not an enhancement."  (*Burke, supra*, at p. 244.)  The Courts of Appeal have consequently thus far rejected the argument that section 1385, subdivision (c), applies to the trial court's authority to dismiss a prior strike conviction under the Three Strikes law.  (*Burke, supra*, at pp. 242−244; *People v. Olay* (2023) 98 Cal.App.5th 60, 64−69 (*Olay*); *People v. Dain* (2024) 99 Cal.App.5th 399, 410 (*Dain*).)

We find the reasoning of our sister courts persuasive.  "The Three Strikes law is a separate sentencing scheme."  (*People v. Henderson* (2022) 14 Cal.5th 34, 43.)  The law does not impose an additional term of imprisonment on top of the base term like an enhancement, but instead, "when applicable, takes the place of whatever law would otherwise determine defendant's sentence for the current offense."  (*Romero, supra*, 13 Cal.4th at p. 524.)  Based on the statute's plain language, section 1385, subdivision (c), applies only to enhancements and, therefore, does not apply to the Three Strikes law as an alternative sentencing scheme.

This interpretation is buttressed by the legislative history of Senate Bill 81.  (See *People v. Harrison* (2013) 57 Cal.4th 1211, 1221–1222 [courts may look to extrinsic aids, including legislative history, to interpret a statute where the statutory language is unclear or ambiguous].)  In a June 2021 bill analysis of Senate Bill 81, the Assembly Committee on Public Safety generally defined an "'enhancement'" consistent with the California Rules of Court.  (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 81 (2021– 2022 Reg. Sess.), as amended Apr. 27, 2021, at p. 5.)  The bill analysis went on to state:

"An enhancement differs from an alternative penalty scheme. An alternative penalty scheme does not add an additional term of imprisonment to the base term; instead, it provides for an alternate sentence for the underlying felony itself when it is proven that certain conditions specified in the statute are true. [Citations.] Th[is] include[s] the Three Strikes Law [citations] among others. The presumption created by this bill applies to enhancements, *but does not encompass alternative penalty schemes*." (*Id.* at pp. 5−6, italics added.) "A more unambiguous statement of the Legislature's intent to adopt the legal meaning of enhancement for section 1385, subdivision (c) can hardly be imagined." (*Olay, supra*, 98 Cal.App.5th at p. 67.)[20]

Furthermore, a factor defendant asserts applies here, section 1385, subdivision (c)(2)(H), "requiring a court to treat the fact that a prior strike conviction is over five years old as a mitigating circumstance would conflict with the Three Strikes law itself." (*Dain, supra*, 99 Cal.App.5th at p. 411.) Specifically, section 667, subdivision (c)(3), expressly states "[t]he length of time between the prior serious or violent felony conviction and the current felony conviction shall not affect the imposition of sentence." As aptly stated by the *Dain* court, "[w]e do not presume the Legislature intended to repeal this provision when it enacted section 1385[, subdivision ](c)(2)(H). [Citation.] Thus, under section 667[, subdivision ](c)(3), the bare fact that a prior strike conviction is over five years old cannot be the basis for dismissing the strike." (*Dain,*

---

[20]     In a footnote, the *Burke* court indicated the legislative history of Senate Bill 81 is "inconsistent with [section 1385, subdivision (c)'s] plain language and suggests that the term enhancement includes the Three Strikes law." (*Burke, supra*, 89 Cal.App.5th at p. 243, fn. 3.) This was based on "repeated expressions that Senate Bill No. 81 was intended to codify the recommendations of the Committee on the Revision of the Penal Code [(CRPC)], … [whose report] repeatedly refers to 'Strikes' as enhancements rather than using the technical legal meaning and does not separate 'Strikes' from inclusion in its recommendation." (*Ibid.*) For its part, the *Olay* court concluded "the broader understanding of the term enhancement used by the CRPC is irrelevant here. And to the extent the legislative history may have been unclear about the meaning of the term enhancement before June 2021, the June 2021 bill analysis cleared up that confusion." (*Olay, supra*, 98 Cal.App.5th at p. 69.) We find the *Olay* court's reasoning more persuasive on this point.

*supra*, at p. 411; see *State Dept. of Public Health v. Superior Court* (2015) 60 Cal.4th 940, 955 [in "harmonizing potentially inconsistent statutes[,]" "''''''[a]ll presumptions are against a repeal by implication'''''''"].)

Section 1385, subdivision (c)(2)(C), the other factor defendant relies on, states: "The application of an enhancement could result in a sentence of over 20 years. In this instance, the enhancement shall be dismissed." Section 667, subdivision (e)(2)(A), sets the minimum term of an indeterminate life sentence for a third striker to include "[i]mprisonment in the state prison for 25 years." (*Id.*, subd. (e)(2)(A)(ii).) Although the Courts of Appeal have unanimously agreed section 1385, subdivision (c)(2)(C), does not require dismissal of an enhancement,[21] application of this mitigating factor could effectively preclude imposition of *any* third strike offense. Again, we do not presume repeal by implication in interpreting potentially inconsistent statutes.

Finally, section 1385, subdivision (c), cannot be construed in a manner that amends the Three Strikes law because the Legislature may only amend the law "by statute passed in each house by rollcall vote entered in the journal, two-thirds of the membership concurring .…" (§ 667, subd. (j).) Senate Bill 81 did not pass by two-thirds of the membership. (*Dain, supra*, 99 Cal.App.5th at p. 412.)

Because section 1385, subdivision (c), as amended by Senate Bill 81 does not apply to the Three Strikes law, the trial court was not required to consider the mitigating factors in that statutory subdivision in ruling on defendant's *Romero* motion.[22]

---

[21] See *People v. Lipscomb* (2022) 87 Cal.App.5th 9, 17–21 (rejecting argument that an enhancement that results in a sentence of over 20 years must be dismissed where it would endanger public safety); accord, *People v. Anderson, supra*, 88 Cal.App.5th at pages 238–241; *People v. Mendoza* (2023) 88 Cal.App.5th 287, 295–297.

[22] We therefore need not and do not consider defendant's argument there is a reasonable probability the court would have dismissed his prior strike based on two mitigating factors in section 1385, subdivision (c)(2).

29.

### C. *Applicable Law to Dismissal of Prior Strike Convictions*

Having concluded section 1385, subdivision (c), is not applicable to prior strike convictions under the Three Strikes law, we now address the applicable law in deciding whether to dismiss a prior strike.

The Three Strikes law was intended "to punish repeat criminal offenders severely" and "drastically curtail a sentencing court's ability to reduce the severity of a sentence by eliminating alternatives to prison incarceration .…" (*People v. Vargas, supra*, 59 Cal.4th at p. 641; accord, *People v. Mayfield* (2020) 50 Cal.App.5th 1096, 1104 (*Mayfield*).) By doing so, the "law creates a strong presumption that any sentence that conforms to these sentencing norms is both rational and proper." (*Carmony, supra*, 33 Cal.4th at p. 378.) A trial court's denial of a request to dismiss a prior strike conviction is reviewed for abuse of discretion. (*Id.* at p. 376.)

"Consistent with the language of and the legislative intent behind the three strikes law," our Supreme Court has "established stringent standards that sentencing courts must follow in order to" dismiss a prior strike conviction. (*Carmony, supra*, 33 Cal.4th at p. 377.) The "trial court must balance society's legitimate interest in imposing longer sentences for repeat offenders and the defendant's constitutional right against disproportionate punishment." (*Mayfield, supra*, 50 Cal.App.5th at p. 1105, citing *Romero, supra*, 13 Cal.4th at pp. 530−531.) The court must also consider "the nature and circumstances of the defendant's present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects." (*People v. Williams* (1998) 17 Cal.4th 148, 161 (*Williams*).) "And, of course, the court must remember the Three Strikes law is not discretionary in nature. Rather, the law must be applied when the defendant has two or more prior strikes, unless the court concludes an exception to the law should be made because, *for articulable reasons that can withstand scrutiny for abuse*, the defendant lies outside the spirit of the law such that he should be treated as though he had not previously been convicted of one or more strikes."

(*Mayfield, supra*, at p. 1105, citing *Williams, supra*, at p. 161 & *Carmony, supra*, at p. 376.)

"In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, '"[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review."' [Citations.] Second, a '"decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.'"' [Citations.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Carmony, supra*, 33 Cal.4th at pp. 376−377.) A court abuses it discretion in failing to dismiss a prior strike in "limited circumstances," including where the court is unaware of its discretion to dismiss, considers impermissible factors or application of the Three Strikes law may as a matter of law produce an arbitrary, capricious, or absurd result under the particular facts of the case. (*Id.* at p. 378.)

**D.    Analysis**

"Where the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling" on whether to dismiss a prior strike. (*People v. Myers* (1999) 69 Cal.App.4th 305, 310.) Furthermore, while the trial court here appears to have erroneously considered whether to dismiss defendant's prior strike conviction under the provisions of section 1385, subdivision (c), remand for resentencing is unnecessary if the evidence shows there is no reasonable possibility the court would have dismissed defendant's prior strike. (*People v. Leonard* (2014) 228 Cal.App.4th 465, 502−504 [remand unnecessary even if the trial court improperly relied on two factual findings in

declining to dismiss prior strike where there was no reasonable possibility the court would have dismissed the prior strike].)[23]

"Extraordinary must the circumstance be by which a career criminal can be deemed to fall outside the spirit of the very statutory scheme within which he squarely falls and whose continued criminal career the law was meant to attack." (*People v. Strong* (2001) 87 Cal.App.4th 328, 332 (*Strong*).) Therefore, the "circumstances where no reasonable people could disagree that [a career] criminal falls outside the spirit of the three strikes scheme must be even more extraordinary." (*Carmony, supra*, 33 Cal.4th at p. 378.)

In *Williams*, the defendant had two prior convictions for attempted robbery and rape when he was convicted of felony driving under the influence. (*Williams, supra*, 17 Cal.4th at pp. 155−157 & fn. 3.) The trial court vacated the prior strike for attempted robbery and sentenced the defendant based on only one strike. (*Id.* at pp. 156−157.) The People appealed and our Supreme Court concluded the trial court abused its discretion. (*Id.* at pp. 157, 162.) The court found nothing about the defendant's present felony, or his prior convictions was favorable to him, particularly considering his latest conviction for driving under the influence was his fourth such offense. (*Id.* at p. 163.) This showed the defendant "'had been taught, through the application of formal sanction, that [such] criminal conduct was unacceptable—but had failed or refused to learn his lesson' [citation]." (*Ibid.*) The court noted the defendant managed to pass 13 years between his prior serious and/or violent convictions and his present offense, but further recognized the defendant "did not refrain from criminal activity during that span of time, and he did not add maturity to age." (*Ibid.*) On the contrary, during those years the defendant was often

---

[23] We may also affirm the court's ruling where it is correct on any legal ground. (*People v. Fox* (2001) 93 Cal.App.4th 394, 399 [affirming the trial court's ruling an Oregon conviction qualified as a prior strike, although the court's reasoning was erroneous]; see *People v. Brooks* (2017) 3 Cal.5th 1, 39 [an appellate court reviews the trial court's ruling, not its reasoning]).

in prison or jail, and when he was not, violated parole and probation, and committed multiple additional felony and misdemeanor offenses.  (*Ibid*.)  The court found the trial court's order to vacate the defendant's prior strike "fell outside the bounds of reason under the applicable law and relevant facts."  (*Id.* at p. 164.)

In *Mayfield*, the defendant threatened to make a pregnant African-American woman "'drop'" her baby, while making racial epithets at the woman as she was waiting at the bus stop.  (*Mayfield, supra*, 50 Cal.App.5th at pp. 1099−1100.)  The defendant had a lengthy criminal record, including a previous hate crime conviction a year before that was reduced from a felony to a misdemeanor, and two prior strike convictions for assault with a deadly weapon in 2005 and mayhem in 2008.  (*Id.* at pp. 1100−1101 & fn. 2.)  Nonetheless, the trial court struck the defendant's 2005 prior strike as well as multiple enhancements and sentenced the defendant to five years in prison.  (*Id.* at pp. 1102−1103.)  The district attorney argued the trial court abused its discretion in dismissing the 2005 strike and the Court of Appeal agreed.  (*Id.* at p. 1103.)  The court found the defendant "failed to reform his behavior during the decade plus that elapsed between his first strike conviction and his third strike conviction."  (*Id.* at p. 1108.)  While the trial court relied on the fact the prior conviction was more than 14 years old, the Court of Appeal stated pursuant to *Williams*, "older strike convictions do not deserve judicial forgiveness unless the defendant has used them as a pivot point for reforming his ways."  (*Id.* at p. 1107.)  The court noted the defendant was "given a tremendous break in 2017 when the court reduced his felony hate crime to a misdemeanor."  (*Id.* at p. 1108.)  Despite this break, the defendant turned around and committed another hate crime against a pregnant victim.  The court concluded the defendant's "unrelenting criminal behavior since suffering his first strike conviction in 2005 demonstrates him to be an unchanged man, with a stubborn character and no discernible prospects for reform."  (*Ibid*.)

Here, as in *Williams* and *Mayfield*, defendant failed to show he has reformed despite the passage of nearly 27 years between his 1991 prior strike for voluntary

33.

manslaughter and the current offense. The circumstances surrounding the 1991 offense were remarkably like the 2018 murder in important respects. Both deaths resulted from defendant violently unleashing his anger against the victim for a seemingly trivial offense. Defendant stabbed the victim in 1991 because he was angry the victim refused to give him tacos. As he later did with Garcia, defendant stabbed his first victim in the heart. This victim immediately went down when defendant stabbed him and died later at the hospital. Far from using his prior conviction as a pivot point for reforming his ways, defendant stabbed Garcia for the apparently unforgiveable sin of talking to his girlfriend and did so in a location defendant knew could be fatal based on his first victim's fate. The trial court rightfully found defendant could at whatever age again give in to his short temper in a violent way.

Nor does defendant's character, background, or prospects reveal much, if anything, that is favorable. While defendant was employed as a truck driver at the time of the murder, he provided Irene with little money. Irene paid most of the bills and supported defendant financially, including paying for the truck that was in his name. Defendant regularly used methamphetamine during the week prior to the current offense. Within days of killing Garcia, defendant choked Irene to the point where she could not breathe because he was angry she was text-messaging someone. Defendant relentlessly tried to persuade Irene against testifying while the instant case was pending, including by making thinly veiled threats. Moreover, defendant did not refrain from criminal activity during the period between his 1991 strike and his murder conviction. Instead, he managed to rack up multiple parole violations and convictions for: threatening phone calls, domestic violence, resisting a peace officer, obstructing a peace officer, and two drug offenses. Defendant cannot be deemed outside the spirit of the Three Strikes law for purposes of his voluntary manslaughter conviction when he is precisely the type of "'revolving-door'" criminal the law was designed to encompass. (*Strong, supra*, 87 Cal.App.4th at p. 338.)

34.

Defendant argues the trial court's "speculation" he would endanger public safety if released at the age of 75 was arbitrary and baseless. Preliminarily, defense counsel specifically argued in his *Romero* motion and at sentencing defendant would not pose a danger to the public if released on parole at the age of 76.[24] Defendant cannot complain on appeal the court improperly considered a factor defendant expressly asked it to consider. (See *People v. Cooper* (1991) 53 Cal.3d 771, 827 [under the doctrine of invited error, the defendant could not complain of the court's failure to instruct on a lesser offense where defense counsel objected to the instruction]; but see *In re Andrews* (1976) 18 Cal.3d 208, 212 [the doctrine of invited error does not apply to an unauthorized sentence].)

To the extent defendant is arguing consideration of whether his release around the age of 75 would endanger public safety was an impermissible factor for the trial court to consider, the argument is meritless. Defendant cannot and does not plausibly argue whether he would pose a danger to society when he is released was not a permissible and relevant factor for the court to consider. Society unquestionably has an interest in protecting citizens by keeping dangerous criminals off the streets. (*Romero, supra*, 13 Cal.4th at p. 530 [whether dismissal is in furtherance of justice under § 1385 requires consideration of the interests of society as represented by the People].) The Three Strikes law "undeniably reflects" a "public safety *animus*." (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 979 (*Alvarez*).) Considering the nature and circumstances of defendant's present and prior felonies, as well as his background and character reasonably involves assessing whether defendant poses a danger to society. (See *People v. McGlothin* (1998) 67 Cal.App.4th 468, 475 ["history of violent conduct demonstrates

---

[24]    At sentencing, defense counsel stated in pertinent part: "Given his age and his background, there's no reason to believe that a 76-year-old [defendant] on parole, were he to be paroled, would present any kind of danger to the public. [¶] … [¶] So the issue isn't what the age is, it's simply the actuarial reality of the fact that an opportunity for [defendant] to be paroled at age 76 does not yield a substantial public safety danger.…"

[the defendant] is a danger to society" in assessing the defendant's character].) California Rules of Court, rule 4.421(b)(1) specifically provides that whether "[t]he defendant has engaged in violent conduct that indicates a serious danger to society" is an aggravating circumstance to consider in determining the defendant's sentence. (*People v. Thomas, supra*, 4 Cal.4th at pp. 211−212 [the trial court may consider the Cal. Rules of Court in determining whether to dismiss an action under § 1385]; *People v. Cluff* (2001) 87 Cal.App.4th 991, 1004 [the trial court should consider the aggravating and mitigating circumstances from the Cal. Rules of Court in exercising its discretion on a *Romero* motion].) The court rationally concluded defendant's history of resorting to violence to resolve minor disputes posed an unacceptable danger to the public.

Defendant claims the trial court's determination was "fundamentally flawed" because the court purportedly failed to consider defendant would only be *eligible* for parole around age 75, but would not be released if the parole board determined he still posed a danger to public safety. Defendant essentially argues the court was precluded from considering whether he would pose a danger to public safety when he would be eligible for parole because the parole board will not release him on parole if he remains a danger.

We are not persuaded. The "paramount consideration" of the Board of Parole Hearings (Board) in making release determinations is "whether the inmate currently poses a threat to public safety and thus may not be released on parole." (*In re Lawrence* (2008) 44 Cal.4th 1181, 1210; see Cal. Code Regs., tit. 15, § 2281, subd. (a).) Simply because the Board must assess whether defendant remains a danger when he is eligible for parole does not bar the trial court from considering this factor when deciding whether to dismiss a prior strike or impose a longer sentence. The court is empowered to determine defendant's sentence in a manner consistent with the Legislature's and the People's goals in enacting the Three Strikes law. (*People v. McGlothin, supra*, 7 Cal.App.4th at p. 476 [both "the Legislature and the People, by initiative, have adopted a

36.

particular sentencing scheme for repeat offenders" within which the trial court must "find that exquisite balance in which a just sentence reposes"].)  The "public safety considerations underlying the three strikes law" is reflected by its imposition of longer sentences for career criminals.  (*Alvarez, supra*, 14 Cal.4th at p. 979; accord, *Strong, supra*, 87 Cal.App.4th at p. 338 ["longer sentences for career criminals who commit at least one serious or violent felony certainly goes to the heart of the statute's purpose—or spirit"].)  "Recidivism is a serious risk to public safety, and so incapacitation is an important goal" of imprisonment.  (*Graham v. Florida* (2010) 560 U.S. 48, 72.)  Implicit in imposition of a longer sentence is a finding defendant poses an unacceptable risk to public safety if released in less time.  The court need not delegate the responsibility to safeguard the public to the Board to assess in the future.

Furthermore, taking defendant's argument to its logical extreme, every court determining an appropriate prison term would be unable to consider whether a defendant will pose a danger to public safety when eligible for parole because the Board must also make this assessment in deciding whether to grant release.  Our criminal justice system is replete with consideration of whether a defendant poses a danger to public safety in making sentencing decisions.  (See, e.g., § 1385, subd. (c)(2) [evidence of mitigating circumstances weighs greatly in favor of dismissing an enhancement "unless the court finds that dismissal of the enhancement would endanger public safety"]; § 1170.18, subd. (b) [if an inmate is eligible for resentencing under the Safe Neighborhoods and Schools Act (Prop. 47, as approved by voters, Gen. Elec. (Nov. 4, 2014)), the court shall resentence the inmate unless resentencing "would pose an unreasonable risk of danger to public safety"]; § 1170.126, subd. (f) [if an inmate is eligible for resentencing under the Three Strikes Reform Act of 2012 (Prop. 36, as approved by voters, Gen. Elec. (Nov. 6, 2012)), the inmate shall be resentenced unless the court determines resentencing "would pose an unreasonable risk of danger to public safety"]; § 1172.75, subd. (d)(1) [resentencing for an enhancement imposed under § 667.5, subd. (b) shall result in a lesser

sentence unless the court finds "imposing a lesser sentence would endanger public safety"].)[25] It was not arbitrary or irrational for the trial court to consider a factor the Legislature has repeatedly identified as relevant to sentencing.

In sum, the trial court did not abuse its discretion in declining to dismiss defendant's prior strike for voluntary manslaughter. The record shows no reasonable possibility the court would have dismissed the prior strike and its ruling did not "'fall[] outside the bounds of reason' under the applicable law and the relevant facts [citations]." (*Williams, supra*, 17 Cal.4th at p. 162.)

## III. Challenge to Assessment Fees and Restitution Fine

Defendant argues the trial court's imposition of assessments and restitution fine violated his right to due process because the court did not first determine whether he has the ability to pay. The People argue defendant's *Dueñas* claim is forfeited because he did not seek a hearing on his ability to pay or present any evidence on that topic. We agree with the People.

### A. Imposition of Assessment Fees and Restitution Fine

At the sentencing hearing on February 23, 2023, defendant asked the trial court to suspend any fines based on his inability to pay. The court imposed a $1,000 restitution fine (§ 1202.4), a $40 court security assessment fee (§ 1465.8, subd. (a)(1)) and a $30 criminal conviction assessment fee (Gov. Code, § 70373, subd. (a)). Defendant did not object to the imposition of fees or the fine or request a hearing on his ability to pay, but he did request a hearing on the amount of victim restitution. At a subsequent hearing on March 30, 2023, defendant stipulated to the amount of $77,500 for victim restitution. The court restated defendant's sentence as well as the fees and fine imposed. Defendant again did not object or request a hearing on his ability to pay.

---

[25] Our analysis is not affected by the differing definitions of "unreasonable risk of danger to public safety" among the statutes. (See e.g., *People v. Valencia* (2017) 3 Cal.5th 347.)

### B.     *Applicable Law and Analysis*

In *Dueñas*, the Court of Appeal held "that due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes" any fines or fees.  (*Dueñas, supra*, 30 Cal.App.5th at p. 1164.)  Subsequent to *Dueñas*, the same court held that "a defendant must in the first instance contest in the trial court his or her ability to pay the fines, fees and assessments to be imposed …."  (*People v. Castellano* (2019) 33 Cal.App.5th 485, 490.)

*Dueñas* was decided in January 2019, more than four years before defendant was sentenced in February 2023.  While defendant asked the trial court to suspend any fines based on his inability to pay, he did not request a hearing on his ability to pay or object to the fees and fine imposed.  Defendant only requested a hearing regarding the amount of victim restitution, an amount he later stipulated to at the subsequent hearing.  Failure to object before the court generally forfeits the issue on appeal and this principle applies equally to constitutional claims like those raised by defendant.  (*People v. McCullough* (2013) 56 Cal.4th 589, 593 [a constitutional right may be forfeited by failure to assert the right before the tribunal with jurisdiction to determine it]; accord, *United States v. Olano* (1993) 507 U.S. 725, 731–732.)  Furthermore, "[i]n general, a defendant who fails to object to the imposition of fines, fees, and assessments at sentencing forfeits the right to challenge those fines, fees, and assessments on appeal."  (*People v. Greeley* (2021) 70 Cal.App.5th 609, 624.)  This is particularly true in cases like this where sentencing occurred after the *Dueñas* court declared a constitutional right to have courts determine ability to pay prior to imposing mandatory fines and fees.  (*Greeley, supra*, at p. 624.)  Further, we cannot say with confidence that an objection to the restitution fine on constitutional grounds would have been futile in light of *Dueñas* having been decided more than four years prior to sentencing in this case.  (See *People v. Welch* (1993) 5 Cal.4th 228, 237 ["Reviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by

substantive law then in existence."].)  Defendant's claim is forfeited, and under the circumstances, we decline to depart from the rule of forfeiture.

Defendant argues whether the trial court could impose the fees and fine on an indigent defendant without making a determination on his ability to pay is a pure question of law subject to de novo review.  He then argues his assessments and fine should be vacated because they were imposed on an indigent defendant without determining his ability to pay, or, in the alternative, the matter be remanded for an ability to pay hearing if the evidence is insufficient to show he is indigent.  An exception to the rule of forfeiture is when a defendant raises constitutional claims on appeal that "involve pure questions of law that can be resolved without reference to the particular sentencing record developed in the trial court."  (*People v. Welch, supra*, 5 Cal.4th at p. 235.)  While our court has previously been divided on the issues of forfeiture where there was no opportunity to object because *Dueñas* (or 8th Amend. cases) had not yet issued at the time an objection would have been timely made (e.g., *People v. Montes* (2021) 59 Cal.App.5th 1107, 1119–1121 [forfeiture excused where futile or unsupported by existing law]; *People v. Son* (2020) 49 Cal.App.5th 565, 596–598; *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1053–1054; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1073–1074), we are in agreement that the question of ability to pay is a fact-intensive inquiry and not a pure question of law (*Montes, supra*, at p. 1121; *Son, supra*, at p. 591; *Lowery, supra*, at pp. 1060–1061; *Aviles, supra*, at pp. 1074–1076).  Defendant does not raise a pure question of law "based on undisputed facts, but his contention instead seeks 'a factual determination of his alleged inability to pay based on a record that contains nothing more than his reliance on appointed counsel at trial.'"  (*Aviles, supra*, at p. 1074.)

## **DISPOSITION**

The judgment is affirmed.


MEEHAN, J.

WE CONCUR:


DETJEN, Acting P. J.


SNAUFFER, J.